**PAYLESS SHOESOURCE, INC., a Missouri Corporation, Plaintiff and Counterclaim Defendant,**

v.

**REEBOK INTERNATIONAL LIMITED and Reebok International Ltd., Defendants and Counterclaim Plaintiffs.**

**No. 92–4208–S.**

United States District Court, D. Kansas.

Oct. 2, 1992.

---

**208**

Don M. Bradley, Joe Rebein, Shook, Hardy & Bacon, Kansas City, Mo., Stephen J. Horace, St. Louis, Mo., for plaintiff.

Kenneth C. Jones, Steven B. Moore, Watson, Ess, Marshall & Enggas, Olathe, Kan., Harley I. Lewin, William M. Ried, Lewin &

Laytin, P.C., New York City, for defendants.

## MEMORANDUM AND ORDER

SAFFELS, Senior District Judge.

This matter is before the court on motion by Reebok International Limited and Reebok International Ltd. ("Reebok") for a preliminary injunction to prevent Payless Shoesource, Inc. ("Payless") from "purchasing, importing, distributing or selling shoes infringing Reebok's federally registered trademarks or trade dress or from making, using or selling shoes infringing Reebok's U.S. design patents" (Doc. 12). Reebok is basing its motion on three grounds involving five Payless shoe models, which Reebok refers to as the "Infringing Footwear." These models are the ProWings HK 48; ProWings 9620; XJ 900; Attack Force 9160; and ProWings 9153.[1]

On August 25, 1992, Payless filed for a declaratory judgment seeking various declarations from the court including that Payless has not infringed Reebok's patents or trademarks, and has done no acts amounting to unfair competition. Reebok answered and counterclaimed for patent and trademark infringement, and state and federal unfair competition. Reebok also filed a motion for a preliminary injunction. On Friday, September 18, 1992, the court held an evidentiary hearing regarding the injunction, which it then took under advisement. After consideration of the evidence, the briefs and arguments of the parties, and the applicable law, the court finds the motion should be denied.[2] The court

1. There was some testimony and question about the Payless internal model numbers and the corresponding Payless shoes, but the court finds these shoes are the alleged infringing models. Any differences are not significant for the purpose of this motion.

2. At the close of the hearing, counsel for Reebok inquired whether the court would consider its reply brief, which it had not had an opportunity to prepare and file. The court set a September 25, 1992, deadline for Reebok to submit its reply brief. The court notes that Reebok's reply improperly attempts to respond to the proceedings at the hearing rather than Payless's memorandum in response to the motion for a preliminary injunction. The reply also seeks to add expert testimony through an affidavit of Edward M. Mazze. The court stated at the hearing that it considered the matter submitted except for the deposition of William Ried and the reply memorandum. Thus, Mr. Mazze's affidavit was be considered. Further, to the extent that Reebok's reply responded to the evidence and arguments presented at the hearing, it was not considered by the court. To do otherwise would have been patently unfair to Payless, which was not given an opportunity to respond to the September 18, 1992, proceedings.

makes the following findings of fact and conclusions of law.

## STANDARD FOR PRELIMINARY INJUNCTION

The granting of a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure is within the sound discretion of this court. Jurisdiction to grant an injunction in trademark infringement cases is also provided by statute, 15 U.S.C. § 1116, as is jurisdiction to grant an injunction in patent infringement cases, 35 U.S.C. § 283.

As a preliminary matter, the court notes that Tenth Circuit law governs the standard for granting a preliminary injunction on Reebok's trademark infringement claim, but the law of the Federal Circuit governs the standards on the patent infringement claim. *Hybritech Inc. v. Abbott Laboratories,* 849 F.2d 1446, 1451 (Fed.Cir.1988).

The standards which govern the granting of a preliminary injunction are well settled in the Tenth Circuit. The moving party must establish: (1) a showing that the movant will suffer irreparable injury unless the injunction issues; (2) a showing that the injunction, if issued, would not be adverse to the public interest; (3) proof that the threatened injury to the movant outweighs whatever damages the proposed injunction may cause the opposing parties; and (4) substantial likelihood that the movant will eventually prevail on the merits. *Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir. 1980). If the movant meets its burden of showing the first three elements, it need only show a fair ground for litigation to meet the substantial likelihood of success element. *See Continental Oil Co. v. Frontier Refining Co.,* 338 F.2d 780, 781–82 (10th Cir.1964). This probability of success burden is met if the movant "raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." 338 F.2d at 782.

The Tenth Circuit has also presumed the element of irreparable injury or harm when the movant has made a showing of trademark infringement, unless the trademark is weak. *Amoco Oil Co. v. Rainbow Snow, Inc.,* 809 F.2d 656, 663 (10th Cir.1987); *see Paramount Pictures Corp. v. Video Broadcasting Systems, Inc.,* 724 F.Supp. 808, 822 (D.Kan.1989). The presumption is undercut if the movant delays seeking the injunction.

The purpose of a preliminary injunction is to maintain the status quo pending a judgment on the merits of the case. *Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.,* 805 F.2d 351, 355 (10th Cir.1986). "In issuing a preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful decision on the merits." *Id.* A preliminary injunction is an extraordinary remedy and is an exception rather than the rule. *GTE Corp. v. Williams,* 731 F.2d 676, 678 (10th Cir.1984).

For the purposes of Reebok's motion for a preliminary injunction with respect to alleged patent infringement by Payless, the Federal Circuit considers the same four factors. *Hybritech Inc. v. Abbott Laboratories,* 849 F.2d at 1451.

In determining the movant's likelihood of success on the merits, there must exist a reasonable likelihood of success on the merits with respect to the validity of the patent and with respect to infringement of the patent. 849 F.2d at 1451. Further, the court must make a finding of irreparable harm or injury, although the nature of the patent grant "weighs against holding that monetary damages will always suffice to make the patentee whole." *Id.* at 1456–57.

## LIKELIHOOD OF SUCCESS ON THE MERITS

### I. TRADEMARK INFRINGEMENT

#### A. Section 32—Lanham Act

Reebok first alleges that both the Payless ProWings HK 48 and the ProWings 9620 infringe Reebok's STARCREST design, which is a registered trademark owned and controlled by Reebok and in continuous use for a number of years. The line of Reebok shoes allegedly infringed is

called the "CLASSIC" and consists of aerobic type shoes. The visible portion of the STARCREST design is described by Reebok as "a semicircle of six geometric shapes radiating from a center, with the five shapes to the right in outline on the background color of the shoe and the one shape furthest to the left filled in red." This design appears on the tongue of the shoe. Reebok alleges that the two Payless models bear copies of the STARCREST design in the same location on the tongue of the shoes.

Reebok further alleges that the Payless ProWings HK 48 contains half of Reebok's STRIPECHECK design, which is also a registered trademark owned and controlled by Reebok and in continuous use for a number of years. This is equivalent to Reebok's Freestyle model. The STRIPECHECK design is a stitching stripe configuration with an overlay design on the side of the shoe. Reebok contends the Payless shoe exhibits the overlay half of its STRIPECHECK design.

■ Section 32 of the Lanham Act imposes liability for any person who:

use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.... 15 U.S.C. § 1114(1)(a).

A trademark is "a distinctive mark, symbol, or emblem used by a producer or manufacturer to identify and distinguish his goods from those of others." *Educational Development Corp. v. Economy Co.*, 562 F.2d 26, 28 (10th Cir.1977). In determining whether a trademark has been infringed, besides determining whether the movant has a valid trademark, the court must evaluate whether "the use of a similar mark is likely to cause confusion in the marketplace concerning the source of the different products." *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 940 (10th Cir. 1983).

The Tenth Circuit has adopted factors to evaluate the likelihood of confusion, which originally were set forth in the *Restatement of Torts* § 729 (1938):

(a) the degree of similarity between the designation and the trade-mark or trade name in

(i) appearance;

(ii) pronunciation of the words used;

(iii) verbal translation of the pictures or designs involved;

(iv) suggestion;

(b) the intent of the actor in adopting the designation;

(c) the relation in use and manner of marketing between the goods or services marketed by the actor and those marketed by the other;

(d) the degree of care likely to be exercised by purchasers. *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d at 940.

These factors are not the only factors the court may consider and no single one is determinative. *Id.* In fact, the court in *Coherent, Inc. v. Coherent Technologies, Inc.*, 736 F.Supp. 1055, 1064 (D.Colo.1990), also considered whether there was actual confusion and other courts have considered the proximity of the products.

■ In evaluating the degree of similarity between the marks, the test is not a side-by-side comparison and the similarities weigh more heavily than the differences. *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d at 940–41. As the court in *Standard Oil Co. v. Standard Oil Co.*, 252 F.2d 65, 74 (10th Cir.1958), stated:

It is not necessary for similarity to go only to the eye or the ear for there to be infringement. The use of a designation which causes confusion because it conveys the same idea, or stimulates the same mental reaction, or has the same meaning is enjoined on the same basis as where the similarity goes to the eye or the ear. Confusion of origin of goods may be caused alone by confusing similarity in the meaning of the designations employed. The whole background of the case must be considered.

As a preliminary matter, the court finds that Reebok has introduced prima facie evi-

dence that its trademarks, the Reebok name and the STRIPECHECK and STARCREST designs are valid. From the verification submitted, it owns and controls United States Trademark Registrations for those trademarks. Thus, the court will be evaluating only the likelihood of confusion.

■ The court has examined the shoes in question and finds a similarity between the Reebok shoes in question and the Payless shoes. The STARCREST design on the Reebok models is very similar to the design found on the tongue of the Payless models, although the Reebok STARCREST design is a full circle extending below the laces. The fact that each shoe bears its own name, i.e. Reebok or Payless, lessens somewhat the similarity of the designs. The STRIPECHECK design similarity is less apparent on the hightop models, but, along with the STARCREST design similarity, does add to the overall similar appearance of the shoes. Certainly a degree of similarity between the products is a prerequisite for a finding of trademark infringement, and the court finds that these products are similar in appearance.

This finding, however, is not dispositive on the issue of whether there is a likelihood of confusion. *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d at 942. The court must also examine other factors. With respect to "the intent of the actor in adopting the designation," the court finds the evidence to be inconclusive. Reebok introduced evidence through the declarations of its private investigator that certain Payless employees made comments regarding the similarity between the Payless shoes and the Reebok shoes. Reebok cites these declarations as evidence of intent to copy Reebok's trademarks. Further, Reebok cites to the declaration testimony of Bryan Collins regarding the legal advice Payless obtained that its shoes did not infringe Reebok's trademarks. Reebok argues that Payless must have suspected it did copy Reebok's trademarks.

■ While the declarations indicate Payless was aware of certain similarities between its shoes and those of Reebok, the legal opinion indicates an intent to avoid infringement. The court does not believe that mere awareness of design similarities by individual Payless store employees equates with intent to copy Reebok's shoes.

Reebok also introduced declaration evidence that a representative of Injection Footwear, who makes shoes for Payless, equated the Payless shoe models with corresponding Reebok shoes. The court is unaware of the contractual arrangement or relationship between this company and Payless and whether Payless had an active role in the creation of shoes that resemble Reebok shoes. This evidence is too weak and speculative to entitle Reebok to the inference of likelihood of confusion.

■ In this case, the manner in which the shoes are marketed is a very significant factor and, in fact, the nature of the marketing makes this case particularly unique and distinguishable from many other trademark infringement cases. While no single factor is determinative, each case must turn on its own facts, and the court finds the facts of this case lend particular weight to the marketing aspects. The evidence was clear and the parties do not dispute that Payless stores only sell Payless shoes, and Payless shoes are sold only in Payless stores. Thus, Payless and Reebok shoes are never sold in the same store. "The possibility of confusion is greatest when products reach the public by the same retail outlets." *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d at 941. By going to a Payless store, the consumer has made a conscious decision to buy a Payless shoe rather than a name brand, such as Reebok, which is available in various types of stores.

The evidence further revealed that Payless customers typically have a family income below $30,000 annually. The Payless shoes in question average approximately $12.99 per pair, while the Reebok shoes sell for anywhere from $30 to well over $100. The court recognizes that stores in which Reebok shoes are sold may discount the shoes or have promotional sales, but the fact remains that the average Payless shoe in question sells for much less than most Reebok shoe models at issue.

The court finds that the marketing channels for the two companies are vastly different. The shoes are never sold at the same store and the cost is markedly different for Payless than for Reebok shoes. On the basis of evidence presented at the hearing, the court finds it inconceivable that a consumer would enter a Payless store, buy a pair of inexpensive Payless shoes, and leave thinking they had just purchased a Reebok shoe.[3] Rather, it is far more likely that a consumer would enter a Payless store and leave, knowing they had just purchased a Payless shoe which looks very much like a Reebok shoe. As long as there is no likelihood the consumer will be confused, the similarity between the various shoes is not infringement.

In addition, the Payless stores are self-service. The consumer enters the store and sees various shoes displayed. The consumer must make a shoe selection, take the box in which the shoe is packaged off the shelf, and carry it to the clerk to pay. The consumer must actually conduct the purchase from start to finish. The court has examined the boxes in which the shoes are packaged and finds them to be distinctively Payless boxes. The court further finds the actual self-service method of purchase in Payless stores lessens even more the likelihood of confusion.

Further, in considering another factor, the court finds that consumers exercise some degree of care in buying athletic shoes. Whether buying a $150 pair of Reebok "PUMPS" or a $12.99 pair of Payless "ProWings" in a Payless store, a consumer is apt to spend some time selecting the shoe eventually to be purchased. Although not a more expensive item such as an automobile or even an appliance, more care is used by consumers in purchasing shoes than in buying a very inexpensive item, such as a grocery product. In addition, because only Payless shoes are sold in Payless stores, the consumer must make a conscious decision to buy a Payless shoe.

Reebok argues that it is also concerned about post-sale confusion. It contends that a consumer seeing someone wearing a Payless shoe might notice that the shoe looks like a Reebok shoe, but is made of vinyl rather than leather. Then the consumer may decide that Reebok shoes look cheap or do not wear well and decide to purchase their next shoes from a maker other than Reebok. The court has not found any case law in the Tenth Circuit adopting the theory of post-sale confusion. In any event, the court does not believe this is an appropriate case to extend the likelihood of confusion requirement. While some consumers may indeed make all of the inferences and arrive at the conclusion Reebok fears, the standard is not the "possibility of confusion." Rather, the standard is "likelihood of confusion." The court finds the likelihood of post-sale confusion is slight.

The court therefore finds that the factors weigh strongly against the likelihood that a consumer will be confused when confronted in the marketplace with the Reebok and the Payless shoes.[4] Reebok has not carried its burden of showing a substantial likelihood of success on the merits for the purpose of obtaining a preliminary injunction on the trademark infringement claim.[5]

3. There was testimony by Edward Lussier that there is a tendency by consumers to believe they have purchased a second tier or second level brand of Reebok shoe, so that confusion may exist even at a Payless store. The court finds that, other than an unsubstantiated belief on the part of Reebok that this could happen, there is no evidence to suggest this is a likely possibility.

4. Reebok introduced some evidence in the form of declarations from consumers who were shown pictures of Payless shoes in various shopping malls in California. In response to the query regarding who made the shoes pictured, the declarants responded "Reebok." This evidence was introduced for the purpose of show-ing actual confusion, as well as similarity between the shoes. The court does not find the declarants' testimony persuasive of actual confusion. This test is so out of context with how the shoes are presented in the marketplace that the court cannot place any value on the results. Further, there is no indication of how the test was conducted and whether this is a partial or complete collection of the results.

5. As will be addressed later in this order, the other factors to consider in determining whether to grant a preliminary injunction do not weigh in favor of granting the injunction. Thus, Reebok is not entitled to the relaxed stan-

### B. Section 43(a)—Lanham Act

▇ Reebok next contends that an injunction should be granted on the basis of unfair competition by Payless. Reebok states several grounds for this allegation. First, Payless has designed shoes to look like certain Reebok model shoes and tries to sell them on the basis that they look "just like" Reebok shoes. Further, Reebok alleges that Payless has made misrepresentations that Payless shoes originate from a manufacturer which used to make Reebok shoes.

In addition, Reebok alleges trade dress violations. Specifically, Reebok first contends that Payless has copied virtually the entire trade dress of the Reebok Freestyle in its ProWings HK 48.

In addition to the STARCREST design on the Payless ProWings 9620, Reebok alleges it also copied virtually the entire trade dress of the Reebok Princess including similar stitching, overlay pieces, and air holes. Finally, Reebok generally alleges trade dress violations of Reebok's line of shoes referred to as "THE PUMP" and of the REEBOK name itself.

▇ Section 43(a) of the Lanham Act prevents unfair competition and trade dress infringement and reads in pertinent part:

(a) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(2) in commercial advertising or promotion, misrepresents the nature, characteristics, or geographic origin of his or her or another person's goods, services, or commercial activities

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125(a).

As to the claim for unfair competition, the same elements must be proven as for a Section 32 claim for infringement. Therefore, the movant must show the likelihood of confusion. *Polo Fashions, Inc. v. Diebolt, Inc.,* 634 F.Supp. 786, 790 (D.Kan. 1986).

The court finds that Reebok has not shown a substantial likelihood that it will prevail on the merits of its unfair competition claim. Reebok did introduce declaration testimony regarding statements made by certain Payless employees to Reebok's investigator regarding the likeness of Payless shoes to Reebok shoes. This does not indicate, however, that Payless attempts to sell its shoes by passing them off as Reebok shoes.

There was also declaration testimony that one customer service representative made a comment that Injection Footwear, which makes shoes for Payless, used to make Reebok shoes. This evidence was unrefuted at the hearing. The court acknowledges that if this is a common practice, it is possible that consumers could become confused as to the source of the shoes and believe they were getting a "knock-off" Reebok shoe. The court will not infer at the preliminary injunction stage of this litigation, however, a likelihood of confusion on the basis of this one cited occurrence.

▇ Protection from trade dress infringement under the above section of the Lanham Act is available when a product, or certain features of a product, becomes so distinctive that, in effect, it is an unregistered trademark. *Hartford House, Ltd. v. Hallmark Cards, Inc.,* 846 F.2d 1268, 1271 (10th Cir.1988). Historically trade dress referred to a product's packaging, but

---

dard of only showing a fair ground for litigation. The court notes, however, that its previously stated findings regarding the lack of likelihood of confusion on the trademark infringement claim would not even meet the lowered standard.

more recently it has acquired a broader meaning and may reference the product's overall appearance. 846 F.2d at 1271.

In order to prevail on a trade dress infringement claim, the movant must show the following:

(1) the trade dress, whether a single feature or a combination of features, must be nonfunctional; (2) the trade dress must have acquired a secondary meaning; and (3) there must be a likelihood of confusion among consumers as to the source of the competing products. 846 F.2d at 1271.

The burden of proof on functionality is on the party opposing the injunction. *Id.* Therefore, the Tenth Circuit has stated that if the mark has acquired secondary meaning and there is a likelihood of confusion, the trade dress is protected unless the party opposing the injunction shows the alleged trade dress is functional.

Because the court's previous analysis on the likelihood of confusion as to the trademark infringement claim under Section 32 of the Lanham Act is equally pertinent here, the court need not address whether Reebok's shoes are deserving of protection on the trade dress infringement theory, except to the following extent. Even if there exists some degree of similarity between the shoes with respect to features identified by Reebok as its trade dress, Reebok cannot show a likelihood of success on the merits of its trade dress infringement claim. The key for the court is the difference in marketing channels and the degree of care with which a consumer selects athletic shoes. The marketing incorporates the difference in price of the respective shoes, the fact that Reebok and Payless shoes are never sold in the same stores and the self-service method of purchasing Payless shoes. Therefore, even if Reebok's trade dress is nonfunctional and has acquired secondary meaning or is inherently distinctive, Reebok cannot get over the likelihood of confusion hurdle. Again, Reebok cannot show a likelihood of success on the merits of its trade dress infringement claim.

## II. PATENT INFRINGEMENT

The second ground upon which Reebok relies for its motion for a preliminary injunction is that of patent infringement. This involves Payless models XJ 900, Attack Force 9160, and ProWings 9153. Reebok holds the design patents on the shoe uppers of three shoe models, which it alleges Payless is imitating in its three models mentioned above. The tongue of the patented shoe upper on each of Reebok's three models bears a three-dimensional semi-spherical device that resembles a basketball. The patents and alleged infringing models are:

U.S. Patent No. Des. 307,508 (the '508 patent) on the Reebok original "THE PUMP," which corresponds to the Payless ProWings 9135;

U.S. Patent No. Des. 326,353 (the '353 patent) on the Reebok "Omni Zone II," which corresponds to the Payless XJ 900; and

U.S. Patent No. Des. 325,809 (the '809 patent) on the Reebok "Blacktop the Boulevard," which corresponds to the Payless Attack Force 9160.

Design patents are granted pursuant to 35 U.S.C. § 171, which reads in pertinent part:

Whoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefor, subject to the conditions and requirements of this title.

Patents are presumed valid and the party challenging the validity of a patent must prove invalidity by clear and convincing evidence. 35 U.S.C. § 282. This includes design patents. *Avia Group Intern, Inc. v. L.A. Gear California*, 853 F.2d 1557, 1562 (Fed.Cir.1988). The court finds that Reebok has presented evidence that it holds patents on the designs in question and is entitled to the presumption that its patents are valid. At this early stage of the litigation, Payless has not seriously challenged the validity of Reebok's patents.

The purpose of design patents is to promote the decorative arts. 853 F.2d at 1563. The parties both cite to *Gorham*

*Mfg. Co. v. White,* 81 U.S. (14 Wall) 511, 20 L.Ed. 731 (1872), as setting forth the benchmark test for determining whether a product infringes a design patent. The Court in *Gorham* stated:

> [I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other. 81 U.S. at 528.

In addition, the court must also find that the novelty of the design patent which distinguishes it from prior art was appropriated by the alleged infringer. *Avia Group Intern., Inc. v. L.A. Gear California,* 853 F.2d at 1565.

The above articulated test does not include the likelihood of confusion as required for a showing of trademark infringement.

> To find infringement, the accused shoes need only appropriate a patentee's protected design, not a patentee's market as well. [Citation omitted.] The products of the parties need not be directly competitive; indeed, an infringer is liable even when the patent owner puts out no product. *A fortiori,* infringement is not avoided by selling to a different class of purchasers than the patentee. 853 F.2d at 1565.

█ In addition to examining the shoes and patents in question, the court has examined the patent references submitted by Payless. It is the opinion of the court that the designs of the Payless shoes are not substantially the same as the patented Reebok designs. In arriving at this conclusion, the court looked at both the similarities and the differences between the three models of shoes. *See Unette Corp. v. Unit Pack Co., Inc.,* 785 F.2d 1026, 1028 (Fed.Cir. 1986).

Admittedly, the court finds similarities between the Payless and Reebok shoes. For example, the corresponding shoes to the '508 patent and the '353 patent each have a facsimile of the orange "PUMP."

In addition, on each model the shape of some of the overlay pieces are the same.

There are, however, some major differences. On the Payless shoe corresponding to the '508 patent shoe, the heel pieces are made differently and there is much less detail on the overlay pieces on the side of the shoe. On the Payless shoe corresponding to the '353 patent, Payless has added an additional color, black. Again, while there is some similarity between the shape of overlay pieces, the Reebok model has much more detail. Much of the overlay design is missing on the Payless models. On all of the Payless shoes, the orange basketball on the tongue does not have a logo, while the Reebok orange "PUMP" has the word "pump" printed in the middle. The court cannot find that Payless appropriated the novelty of the design patents.

Interestingly, on the Payless model corresponding to the '809 patent, Payless has an orange basketball on the tongue, which the Reebok shoe does not have. In addition, if one looks at these particular shoes from the top, they look very similar. A side view, however, shows only a slight similarity in the shape of one overlay piece. The Reebok '809 patent model contains so much more detail that it dilutes the similarity apparent from other angles.

In short, at first glance the Payless shoes are similar to the Reebok shoes. The remaining part of the *Gorham* test, however, requires the court to consider the similarity from the perspective of "an ordinary observer, giving such attention as a purchaser usually gives." *Gorham Mfg. Co. v. White,* 81 U.S. at 528. The court believes an ordinary purchaser of athletic shoes is going to give more attention than just a glance when buying shoes and will not be deceived that the Payless shoes are Reebok shoes. The overall appearance of the Payless shoes has less overlay detail than the Reebok patented models. The similarities between the shoes in question are overshadowed by the many differences. Thus, Reebok has not shown a reasonable likelihood of success on the merits of its patent infringement claim.

### III. STATE COMMON LAW UNFAIR COMPETITION

Reebok alleges that if it proves the elements required for a federal trademark infringement cause of action, it has proved the Kansas unfair competition cause of action. Therefore, if Reebok is entitled to an injunction for unfair competition under federal law, it is also entitled to an injunction under the state common law. The court finds that because Reebok has not met its burden on any of its theories to obtain a preliminary injunction, it likewise cannot meet its burden here.

### REMAINING PRELIMINARY INJUNCTION FACTORS

Even if Reebok had been able to demonstrate to the court that it was likely to succeed on the merits of its claim, the court would be disinclined to grant the preliminary injunction. The balance of harms in this case tips decidedly in Payless's favor. The court heard much evidence regarding the financial impact an injunction would have on Payless and finds such evidence credible on the issue of harm.[6]

While some of the harm to Payless was speculative, such as the cost if the enjoined shoes could never be sold, the financial impact of a preliminary injunction on Payless would be significant. In addition, Payless would have no substitute models for the shoes taken off its shelves for approximately 60 to 90 days, and the additional losses to Payless by customers who would look elsewhere for inexpensive athletic shoes would be great. The potential harm to Payless's reputation while awaiting a decision on the merits of the case could be devastating to this line of its business. That is not to say that Reebok would not be harmed by a denial of the injunction. Certainly the potential exists for harm to Reebok's reputation if it would ultimately prevail on the merits of its case and Payless was allowed to sell its shoes in the meantime. There was evidence introduced at the hearing, however, that Payless has sold some forms of these shoes since the mid-to-late 1980s. This at least raises a factual issue that goes to the immediacy and potential for harm to Reebok. Further, the market channels are vastly different, which will decrease the likelihood of irreparable harm to Reebok. The court simply believes that on the present showing, Reebok is not likely to succeed on the merits and the potential harm to Payless is greater than that to Reebok.

Further, the movant has an even greater burden in showing that an injunction should issue when the requested relief would, in effect, grant a significant portion of the relief the movant would obtain if it prevailed at trial. *GTE v. Williams*, 731 F.2d at 679. That is precisely the situation in this case. Reebok's requested relief is primarily for a permanent injunction similar in scope to the preliminary injunction request.

In addition, the court believes taking an inexpensive alternative to Reebok's more expensive shoes off the market would deprive a large portion of the consuming public of affordable, stylish athletic shoes. Many of the consumers who shop at Payless stores cannot afford to buy Reebok shoes. Although there may be cross-over consumers who can and do buy both parties' shoes, the harm to the public is to those many individuals who cannot spend the additional money for "Reebok's." Therefore, balancing both the harm of the parties and the harm to the public, the court finds on the basis of these additional factors that a preliminary injunction is ill-advised at this time.

IT IS BY THE COURT THEREFORE ORDERED that Reebok's motion for a preliminary injunction (Doc. 12) is denied.

IT IS FURTHER ORDERED that Payless's motion for leave to file a supplemental memorandum is denied as moot.

---

6. This evidence was taken in closed court and the testimony and documents were admitted under seal. The court will only discuss the evidence to the extent necessary for a resolution of this issue.